

[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# Court of Justice of the European Communities (including Court of First Instance Decisions)

You are here: BAILII >> Databases >> Court of Justice of the European Communities (including Court of First Instance Decisions) >> Council of the European Union v Fulmen, [2013] EUECJ C-280/12 (28 November 2013)
URL: *http://www.bailii.org/eu/cases/EUECJ/2013/C28012.html*
Cite as: [2013] EUECJ C-280/12

[New search] [Help]

JUDGMENT OF THE COURT (Fifth Chamber)

28 November 2013 (*)

(Appeal – Restrictive measures against the Islamic Republic of Iran with the aim of preventing nuclear proliferation – Freezing of funds – Obligation to substantiate the measure)

In Case C-280/12 P,

APPEAL under Article 56 of the Statute of the Court of Justice of the European Union, brought on 4 June 2012,

**Council of the European Union,** represented by M. Bishop and R. Liudvinaviciute-Cordeiro, acting as Agents,

appellant,

supported by:

**United Kingdom of Great Britain and Northern Ireland,** represented by J. Beeko and A. Robinson, acting as Agents, and by S. Lee, Barrister,

**French Republic,** represented by E. Ranaivoson and D. Colas, acting as Agents,

interveners in the appeal,

the other parties to the proceedings being:

**Fulmen,** established in Tehran (Iran),

**Fereydoun Mahmoudian,** residing in Tehran,

represented by A. Kronshagen and C. Hirtzberger, avocats,

applicants at first instance,

**European Commission,** represented by M. Konstantinidis, acting as Agent,

intervener at first instance,

THE COURT (Fifth Chamber),

> composed of T. von Danwitz, President of the Chamber, E. Juhász, A. Rosas (Rapporteur), D. Šváby and C. Vajda, Judges,
>
> Advocate General: M. Wathelet,
>
> Registrar: V. Tourrès, Administrator,
>
> having regard to the written procedure and further to the hearing on 4 July 2013,
>
> having decided, after hearing the Advocate General, to proceed to judgment without an Opinion,
>
> gives the following

**Judgment**

1   By its appeal, the Council of the European Union requests the Court of Justice to set aside the judgment of the General Court of the European Union of 21 March 2012 in Joined Cases T-439/10 and T-440/10 *Fulmen and Mahmoudian* v *Council* [2012] ECR II-0000 ('the judgment under appeal'), by which the General Court annulled the following measures in so far as they concern Fulmen and Mr Mahmoudian:

–   Council Decision 2010/413/CFSP of 26 July 2010 concerning restrictive measures against Iran and repealing Common Position 2007/140/CFSP (OJ 2010 L 195, p. 39, and corrigendum OJ 2010 L 197, p. 19);

–   Council Implementing Regulation (EU) No 668/2010 of 26 July 2010 implementing Article 7(2) of Regulation (EC) No 423/2007 concerning restrictive measures against Iran (OJ 2010 L 195, p. 25);

–   Council Decision 2010/644/CFSP of 25 October 2010 amending Decision 2010/413 (OJ 2010 L 281, p. 81);

–   Council Regulation (EU) No 961/2010 of 25 October 2010 on restrictive measures against Iran and repealing Regulation No 423/2007 (OJ 2010 L 281, p. 1) (together 'the acts at issue');

ordered that the effects of Decision 2010/413, as amended by Decision 2010/644, be maintained until the annulment of Regulation No 961/2010 takes effect, and dismissed the action as to the remainder.

**Legal context and background to the dispute**

2   The Treaty on the Non-Proliferation of Nuclear Weapons was opened for signature on 1 July 1968 in London, Moscow and Washington. The 28 Member States of the European Union are contracting parties to it, as is the Islamic Republic of Iran.

3   Article II of that Treaty provides inter alia that '[e]ach non-nuclear-weapon State Party to the Treaty undertakes ... not to manufacture or otherwise acquire nuclear weapons or other nuclear explosive devices ...'.

4       Article III.1 of that Treaty provides that '[e]ach non-nuclear-weapon State Party to the Treaty undertakes to accept safeguards, as set forth in an agreement to be negotiated and concluded with the International Atomic Energy Agency ["the IAEA"] in accordance with the Statute of the [IAEA] and the Agency's safeguards system, for the exclusive purpose of verification of the fulfilment of its obligations assumed under this Treaty with a view to preventing diversion of nuclear energy from peaceful uses to nuclear weapons or other nuclear explosive devices …'.

5       In accordance with Article III B 4 of its Statute, the IAEA submits reports on its activities annually to the General Assembly of the United Nations and, when appropriate, to the United Nations Security Council ('Security Council').

6       Concerned over the many reports of the IAEA Director General and resolutions of the IAEA Board of Governors related to the nuclear programme of the Islamic Republic of Iran, the Security Council adopted Resolution 1737 (2006) on 23 December 2006, the Annex to which lists a series of persons and entities regarded as being involved in nuclear proliferation, whose funds and economic resources were required to be frozen.

7       In order to implement Resolution 1737 (2006) in the European Union, the Council adopted Common Position 2007/140/CFSP concerning restrictive measures against Iran (OJ 2007 L 61, p. 49) on 27 February 2007.

8       Article 5(1) of Common Position 2007/140 provided for the freezing of all the funds and economic resources of certain categories of persons and entities listed in Article 5(1)(a) and (b). Thus, point (a) of Article 5(1) referred to persons and entities designated in the Annex to Resolution 1737 (2006) as well as additional persons and entities designated by the Security Council or by the Security Council Committee established pursuant to Paragraph 18 of Resolution 1737 (2006). The list of those persons and entities was set out in Annex I to Common Position 2007/140. Point (b) of Article 5(1) referred to persons and entities not covered by Annex I that, inter alia, are engaged in, directly associated with, or providing support for, Iran's proliferation sensitive nuclear activities. The list of those persons and entities was set out in Annex II to Common Position 2007/140.

9       As regards the powers of the European Community, Resolution 1737 (2006) was implemented by Council Regulation (EC) No 423/2007 of 19 April 2007 concerning restrictive measures against Iran (OJ 2007 L 103, p. 1), which was adopted on the basis of Articles 60 EC and 301 EC and refers to Common Position 2007/140, the content of which is essentially similar, in that the same names of entities and of natural persons are listed in Annexes IV (persons, entities and bodies designated by the Security Council) and V (persons, entities and bodies other than those listed in Annex IV) to that regulation.

10      Article 7(2)(a) of Regulation No 423/2007 was worded as follows:

'All funds and economic resources belonging to, owned, held or controlled by the persons, entities and bodies listed in Annex V shall be frozen. Annex V shall include natural and legal persons, entities and bodies, not covered by Annex IV, who, in accordance with Article 5(1)(b) of Common Position 2007/140…, have been identified as:

> (a)    being engaged in, directly associated with, or providing support for, Iran's proliferation-sensitive nuclear activities'.

11      Noting that the Islamic Republic of Iran was not complying with the resolutions of the Security Council, that it had constructed a power plant at Qom in breach of its obligations to suspend all nuclear enrichment-related activities and had not disclosed this until September 2009, that it was failing to notify and refusing to cooperate with the IAEA, the Security Council, by Resolution 1929 (2010) of 9 June 2010, adopted stricter measures directed, in particular, against Iranian shipping

companies, the sector relating to ballistic missiles capable of delivering nuclear weapons, and the Islamic Revolutionary Guard Corps.

12      In a declaration annexed to its Conclusions of 17 June 2010, the European Council underlined its deepening concerns about Iran's nuclear programme, welcomed the adoption by the Security Council of Resolution 1929 (2010) and noted the last report of the IAEA, dated 31 May 2010.

13      In paragraph 4 of that declaration, the European Council considered the introduction of new restrictive measures to have become inevitable. In the light of the work undertaken by the Foreign Affairs Council, the European Council invited the Foreign Affairs Council to adopt at its next session measures implementing those contained in Security Council Resolution 1929 (2010) as well as accompanying measures, with a view to supporting the resolution of all outstanding concerns regarding the development by the Islamic Republic of Iran of sensitive technologies in support of its nuclear and missile programmes, through negotiation. Those measures were to focus on the following areas:

'the areas of trade, especially dual use goods and further restrictions on trade insurance; the financial sector, including freeze of additional Iranian banks and restrictions on banking and insurance; the Iranian transport sector, in particular the Islamic Republic of Iran Shipping Line (IRISL) and its subsidiaries and air cargo; key sectors of the gas and oil industry with prohibition of new investment, technical assistance and transfers of technologies, equipment and services related to these areas, in particular related to refining, liquefaction and LNG technology; and new visa bans and asset freezes especially on the Islamic Revolutionary Guard Corps (IRGC)'.

14      By Decision 2010/413, the Council implemented that declaration, repealing Common Position 2007/140 and adopting additional restrictive measures as compared therewith.

15      Article 20(1) of Decision 2010/413 provides for the funds of several categories of persons and entities to be frozen. Point (a) of Article 20(1) refers to persons and entities designated by the Security Council, who are listed in Annex I to the decision. Point (b) of Article 20(1) relates, inter alia, to 'persons and entities not covered by Annex I that are engaged in, directly associated with, or providing support for, Iran's proliferation-sensitive nuclear activities or for the development of nuclear weapon delivery systems, including through the involvement in procurement of the prohibited items, goods, equipment, materials and technology, or persons or entities acting on their behalf or at their direction, or entities owned or controlled by them, including through illicit means, … as listed in Annex II'.

16      The applicant in Case T-439/10, Fulmen, is an Iranian company, active in particular in the electrical equipment sector. It is listed at point 13 of Part I B of Annex II to Decision 2010/413. The statement of reasons is as follows:

> 'Fulmen was involved in the installation of electrical equipment on the Qom/Fordoo site before its existence had been revealed.'

17      According to paragraph 2 of the judgment under appeal, the applicant in Case T-440/10, Mr Mahmoudian, is Fulmen's majority shareholder and Chairman of its Board of Directors. He is listed at point 9 of Part I A of Annex II to Decision 2010/413. The statement of reasons is: 'Director of Fulmen'.

18      By Implementing Regulation No 668/2010, adopted to implement Article 7(2) of Regulation No 423/2007, Fulmen's name, mentioned at point 11 of Part I B of the Annex to Implementing Regulation No 668/2010, was added to the list of legal persons, entities and bodies set out in Table I of Annex V to Regulation No 423/2007.

19   The following statement of reasons was given:

'Fulmen was involved in the installation of electrical equipment on the Qom/Fordoo site at a time when the existence of the site had not yet been revealed.'

20   Mr Mahmoudian, mentioned at point 2 of Part I A of the Annex to Implementing Regulation No 668/2010, was added to the list of natural persons set out in Table I of Annex V to Regulation No 423/2007. The statement of reasons relating to him is identical to that contained in Decision 2010/413.

21   Annex II to Decision 2010/413 was reviewed and rewritten by Decision 2010/644.

22   Recitals 2 to 5 in the preamble to Decision 2010/644 are worded as follows:

'(2)   The Council has carried out a complete review of the list of persons and entities, as set out in Annex II to Decision 2010/413/CFSP, to which Articles 19(1)(b) and 20(1)(b) of the Decision apply. When doing so, the Council took account of observations submitted by those concerned.

(3)   The Council has concluded that, with the exception of two entities, the persons and entities listed in Annex II to Decision 2010/413/CFSP should continue to be subject to the specific restrictive measures provided for therein.

(4)   The Council has also concluded that the entries concerning certain entities in the list should be amended.

(5)   The list of persons and entities referred to in Articles 19(1)(b) and 20(1)(b) of Decision 2010/413/CFSP should be updated accordingly.'

23   Fulmen's name was included at point 13 of the list of entities set out in Table I of Annex II to Decision 2010/413, as amended by Decision 2010/644. The statement of reasons relating to Fulmen is identical to that set out in Decision 2010/413.

24   Mr Mahmoudian's name was included at point 9 of the list of persons set out in Table I of Annex II to Decision 2010/413, as amended by Decision 2010/644. The statement of reasons relating to him is identical to that contained in Decision 2010/413.

25   Regulation No 423/2007 was repealed by Regulation No 961/2010.

26   Article 16 of Regulation No 961/2010 provides inter alia for the funds and economic resources belonging to or controlled by certain persons, entities and bodies to be frozen. Article 16(1) refers to persons, entities or bodies designated by the Security Council and listed in Annex VII to that regulation.

27   Under Article 16(2) of Regulation No 961/2010:

'2.   All funds and economic resources belonging to, owned, held or controlled by the persons, entities and bodies listed in Annex VIII shall be frozen. Annex VIII shall include the natural and legal persons, entities and bodies ... who, in accordance with Article 20(1)(b) of [Decision 2010/413], have been identified as:

(a)   being engaged in, directly associated with, or providing support for Iran's proliferation-sensitive nuclear activities or the development of nuclear weapon delivery systems by Iran, including through involvement in the procurement of prohibited goods and technology, or being owned or controlled by such a person, entity or body, including through illicit means, or acting on their behalf

or at their direction;

…'

28   Fulmen's name was listed by the Council at point 13 of the list of legal persons, entities and bodies set out in Annex VIII B to Regulation No 961/2010. The reasons for that listing are identical to those set out in Decision 2010/413.

29   Mr Mahmoudian's name was included at point 14 of the list of natural persons set out in Annex VIII A to Regulation No 961/2010. The reasons for that listing are identical to those contained in Decision 2010/413.

30   By respective registered letters of 26 August and 14 September 2010, Mr Mahmoudian and Fulmen asked the Council to remove their names from the lists concerned and also to notify them of the evidence on the basis of which the restrictive measures concerning them had been adopted. By letters of 28 October 2010, the Council rejected those requests. It replied to Mr Mahmoudian and to Fulmen in that regard that its decision to maintain their names in the contested lists was not based on any factors other than those referred to in the reasons stated for those lists.

**The procedure before the General Court and the judgment under appeal**

31   By applications lodged at the General Court Registry on 24 September 2010, Fulmen and Mr Mahmoudian each brought an action for annulment of Decision 2010/413 and Implementing Regulation No 668/2010. Those cases, registered under numbers T-439/10 and T-440/10 respectively, were joined for the purposes of the oral procedure and of the judgment.

32   In their replies, Fulmen and Mr Mahmoudian extended their heads of claim to include annulment of Decision 2010/644 and of Regulation No 961/2010 in so far as those measures affect them. They also asked the General Court to recognise the damage suffered by them due to the adoption of the acts at issue.

33   The General Court, first of all, rejected the first plea in law, alleging infringement of the obligation to state reasons, of the rights of the defence and of the right to effective judicial protection, considering, in essence, that the statement of reasons for the acts concerned, albeit brief, had been sufficient to enable Fulmen and Mr Mahmoudian to understand what they were accused of and to bring an action.

34   Next, the General Court examined the third plea, alleging error of assessment as regards the involvement of Fulmen and Mr Mahmoudian in nuclear proliferation. They maintained that the Council had not adduced evidence that Fulmen had been active on the Qom/Fordoo site. The Council replied that it could not be expected to adduce evidence of that claim. According to the Council, review by the Courts of the European Union must be limited to determining that the reasons relied on to justify the adoption of the restrictive measures are 'probable'. That applied to the present case, given that Fulmen is a company which has long been active in the Iranian electrical equipment market and has a substantial workforce.

35   In paragraphs 96 to 104 of the judgment under appeal, the General Court ruled as follows:

'96   In that regard, it must be recalled that the judicial review of the lawfulness of a measure whereby restrictive measures are imposed on an entity extends to the assessment of the facts and circumstances relied on as justifying it, and to the evidence and information on which that assessment is based. In the event of challenge, it is for the Council to present that evidence for review by [the C]ourts of the European Union (see, to that effect, Case T-390/08 *Bank Melli Iran* v *Council* [[2009] ECR II-3967], paragraphs 37 and 107).

97    Accordingly, contrary to what is claimed by the Council, the review of lawfulness which must be carried out in the present case is not limited to an appraisal of the abstract "probability" of the grounds relied on, but must include the question whether those grounds are supported, to the requisite legal standard, by concrete evidence and information.

98    Nor can the Council claim that it is not required to adduce such evidence.

99    In that regard, first, the Council contends that the restrictive measures imposed on the applicants were adopted on the proposal of a Member State, in accordance with the procedure provided for in Article 23(2) of Decision 2010/413. That circumstance however in no way detracts from the fact that the [acts at issue] are measures taken by the Council, which must, therefore, ensure that their adoption is justified, if necessary by requesting the Member State concerned to submit to it the evidence and information required for that purpose.

100    Secondly, the Council cannot rely on a claim that the evidence concerned comes from confidential sources and cannot, consequently, be disclosed. While that circumstance might, possibly, justify restrictions in relation to the communication of that evidence to [Fulmen or Mr Mahmoudian] or their lawyers, the fact remains that, taking into consideration the essential role of judicial review in the context of adoption of restrictive measures, the [C]ourts of the European Union must be able review the lawfulness and merits of such measures without it being possible to raise objections that the evidence and information used by the Council is secret or confidential (see, by analogy, [Case T-228/02 *Organisation des Modjahedines du peuple d'Iran* v *Council* [2006] ECR II-4665,] paragraph 155). Further, the Council is not entitled to base an act adopting restrictive measures on information or evidence in the file communicated by a Member State, if that Member State is not willing to authorise its communication to the [C]ourts of the European Union whose task is to review the lawfulness of that decision (see, by analogy, Case T-284/08 *People's Mojahedin Organization of Iran* v *Council* [2008] ECR II-3487, paragraph 73).

101    Thirdly, the Council is incorrect in its claim that it cannot be expected to adduce proof of the involvement of an entity in nuclear proliferation, taking into consideration the clandestine nature of the conduct concerned. The mere fact that the adoption of restrictive measures is proposed pursuant to Article 23(2) of Decision 2010/413 presupposes that the Member State concerned or the High Representative of the Union for Foreign Affairs and Security Policy, as the case may be, are in possession of evidence or information demonstrating, in their opinion, that the entity concerned is involved in nuclear proliferation. Further, difficulties which may be encountered by the Council when attempting to prove that involvement may, in some cases, have an effect on the standard of proof required of it. On the other hand, the effect of such difficulties cannot be that the Council is entirely relieved of the burden of proof which rests on it.

102    As regards the assessment in the present case, the Council has produced no information or evidence in support of the reasons relied on in the [acts at issue]. As the Council itself admits, in essence, it has relied on mere unsubstantiated allegations that Fulmen installed electrical equipment on the Qom/Fordoo site before the existence of that site was discovered.

103    In those circumstances, since it must be held that the Council has not adduced evidence that Fulmen was active on the Qom/Fordoo site and, therefore, the third plea in law must be upheld, it is unnecessary to express any view on the second argument, put forward by Mr Mahmoudian in Case T-440/10, concerning his position within Fulmen.

104    Since the Council has not, in the [acts at issue], relied on other circumstances justifying the adoption of restrictive measures with regard to Fulmen and Mr Mahmoudian, the [acts at issue] must be annulled in so far as they concern [Fulmen and Mr Mahmoudian].'

36   So as to ensure that legal certainty would not be jeopardised, the General Court maintained the effects of Decision 2010/413, as amended by Decision 2010/644, pending the ruling of the Court of Justice on the appeal. Under the second paragraph of Article 60 of the Statute of the Court of Justice of the European Union, the appeal has suspensory effect in relation to a decision of the General Court annulling a regulation – in this instance Regulation No 961/2010 – until the decision by which the Court of Justice rules on the appeal.

**Procedure before the Court of Justice and forms of order sought**

37   By order of the President of the Court of 24 October 2012, the French Republic and the United Kingdom of Great Britain and Northern Ireland were granted leave to intervene in support of the form of order sought by the Council.

38   The Council claims that the Court should:

– set aside the judgment under appeal;

– give a final ruling on the dispute and dismiss the actions brought by Fulmen and Mr Mahmoudian against the acts at issue;

– order Fulmen and Mr Mahmoudian to pay the costs incurred by the Council at first instance and in connection with the present appeal.

39   Fulmen and Mr Mahmoudian contend that the Court should:

– dismiss the appeal;

– confirm the judgment under appeal, by which the General Court annulled the acts at issue in so far as they concern Fulmen and Mr Mahmoudian;

– if necessary, annul Council Regulation (EU) No 267/2012 of 23 March 2012 concerning restrictive measures against Iran and repealing Regulation (EU) No 961/2010 (OJ 2012 L 88, p. 1);

– order the Council to pay the costs.

40   The French Republic and the United Kingdom of Great Britain and Northern Ireland submit that the Court should allow the Council's appeal.

41   The Commission has not lodged a response.

**The appeal**

*Arguments of the parties*

42   The Council submits that the General Court erred in law in holding that the Council was required to adduce evidence to prove that Fulmen was active on the Qom/Fordoo site notwithstanding the fact that the evidence that could be put forward comes from confidential sources. The General Court's errors of law concern two aspects of the communication of that evidence. The first relates to the communication of evidence by the Member States to the Council, and the second to the communication of confidential material to the Court.

43   As a preliminary point, the Council, supported by the French Republic, notes that the nuclear facility on the Qom/Fordoo site was constructed clandestinely without being declared to the IAEA

and in breach of Security Council resolutions. The French Republic cites Resolution 1929 (2010), the preamble to which includes a reference to the enrichment facility at Qom. Owing to the clandestine nature of the construction of the Qom site, a Member State might deem the non-disclosure of confidential documents to be necessary for its security, which the General Court did not sufficiently take into account.

44    By its first complaint the Council challenges paragraph 99 of the judgment under appeal, by which the General Court held that, in order to verify that the adoption, on the proposal of a Member State, of restrictive measures is justified, the Council must, if necessary, request the Member State concerned to submit to it the evidence and information required for that purpose. According to the Council, where that material comes from confidential sources, it may legitimately decide to adopt a restrictive measure on the basis only of the explanatory memorandum submitted by a Member State, provided that that memorandum is objectively probable. That approach is consistent with the principle of mutual confidence that must prevail between the Member States and between those States and the institutions of the European Union, as well as with the principle of sincere cooperation, as laid down in the first subparagraph of Article 4(3) TEU.

45    The French Republic also considers that an – objectively reasonable – explanatory memorandum sent by a Member State to the Council was sufficient in the context of the adoption of restrictive measures, and refers to Article 346(1)(a) TFEU, which states that 'no Member State shall be obliged to supply information the disclosure of which it considers contrary to the essential interests of its security'.

46    The Council notes moreover that, according to the case-law of the European Court of Human Rights, the entitlement to disclosure of evidence as part of the rights of the defence is not an absolute right (judgment of the European Court of Human Rights in *Jasper v. United Kingdom* [GC], no. 27052/95, § 52, 16 February 2000). That case-law, which relates to the provisions of Article 6(1) of the European Convention for the Protection of Human Rights and Fundamental Freedoms, signed in Rome on 4 November 1950, governing the determination of criminal charges, is particularly relevant to the restrictive measures in question.

47    In support of that Council complaint, the United Kingdom submits, in the first place, that Council decisions adopted on the basis of Article 29 TEU require unanimity under Article 31 TEU. In the second place the United Kingdom maintains that, in voting on a Member State's proposal, other Member States will bring their own expertise and knowledge to bear when making their decision. Last, in the third place, it submits that some information may have been shared between some Member States on a bilateral basis. If Member States take the view that the alleged involvement of persons or entities in proliferation-sensitive nuclear acts, as referred to in a proposal for a Council decision, is arbitrary, improbable, or far-fetched, then they should refuse to adopt the decision.

48    By its second complaint the Council challenges paragraph 100 of the judgment under appeal, by which the General Court held that the secrecy or confidentiality of the evidence and information supporting the adoption of the restrictive measures cannot be raised as an objection before the Courts of the European Union.

49    According to the Council, the General Court failed to have regard to the provisions of Article 67(3) of its Rules of Procedure, which provides that the General Court is to take into consideration only those documents which have been made available to the lawyers and the agents of the parties and on which they have been given an opportunity of expressing their views. It submits that the Rules of Procedure of the General Court do not, as they stand, allow a party to communicate to the General Court confidential material in such a way that it may be taken into account without being disclosed to the lawyers of the opposite party. The French Republic claims in that regard that the Council cannot be criticised for having failed to provide for an amendment to the Rules of Procedure

of the General Court, since it is for the General Court to draw up its rules of procedure in agreement with the Court of Justice, with the approval of the Council. According to the French Republic and the United Kingdom, for so long as the General Court cannot take into account confidential material if it has not communicated that material to the applicant's lawyers, it is difficult for Member States to accept that the confidential material that is available to them and which substantiates the restrictive measures in question should be communicated to the General Court.

50    At the hearing, the Council claimed that it is entitled to impose general economic sanctions or to target certain sectors of the Iranian economy, in accordance with Article 215(1) TFEU. The decision to favour targeted measures reduces the adverse effects of the restrictive measures on the population, but the difficulty lies in the provision of evidence of the existence of – frequently clandestine – activities justifying the adoption of those measures. It also notes that, in paragraph 49 of the judgment under appeal, the General Court considered that the security of the European Union or of its Member States or the conduct of their international relations might justify a derogation from the obligation to communicate the grounds justifying the adoption of the restrictive measures in question, but that it – wrongly – failed to apply that derogation to the evidence of the alleged conduct.

51    The United Kingdom maintains that the General Court ought to have considered how legitimate interests to be protected by the application of restrictive measures and the interests to be protected by preserving confidentiality, on the one hand, and the provision of effective judicial protection, on the other, should be reconciled. It claims that, since the European Union has not yet put in place procedures that would enable confidential documents to be communicated to the General Court, it is appropriate for the General Court, in the context of that reconciliation, to pay more attention to the interests of peace and security than to those of a person subjected to restrictive measures. It observes that the measures in question are preventive, not penal. Although they are intrusive and in many cases have serious effects, they are nevertheless accompanied by specific provisions which provide protections for those affected by the measures, such as Articles 19 and 21 of Regulation No 961/2010.

52    Fulmen and Mr Mahmoudian contend, in the first place, that the arguments relating to the existence of sources having to remain confidential is a new line of argument that was never mentioned by the Council at first instance, except during the oral submissions on the questions put to the Council by the General Court.

53    They contend, in the second place and in the alternative, that the existence of material derived from confidential sources constitutes a derogation not only from the principle of respect for the rights of the defence but also from the obligation to adduce adequate proof of the facts underlying the decision taken.

54    Furthermore, Fulmen and Mr Mahmoudian note that, pursuant in particular to the third subparagraph of Article 67(3) of the Rules of Procedure of the General Court, the Council's argument that it is not possible to communicate to the General Court confidential material in such a way that it may be taken into account without being disclosed to the lawyers of the opposite party should be rejected.

55    They state in that regard that the Council never mentioned any confidential material in support of its decision. They recall having sent two registered letters, on 26 August and 14 September 2010, expressing surprise at the absence of evidence to support the decisions taken. After the judicial proceedings were initiated, the Council never mentioned the existence of confidential material communicated by one of the Member States and/or by the European External Action Service.

56    Fulmen and Mr Mahmoudian also contend that even if such confidential material exists, the reasons for the decision were very vague and did not enable either Fulmen or Mr Mahmoudian to put

forward an effective defence. They recall the numerous errors in relation both to Fulmen and to Mr Mahmoudian that appeared in the decision and which were pointed out to the General Court. According to them, those errors cast doubt on the reliability of the Council's statements regarding the existence of confidential material.

*Findings of the Court*

57    The two complaints of which the Council's plea is composed must be examined together. In paragraphs 99 and 100 of the judgment under appeal the General Court responds to Fulmen's and Mr Mahmoudian's arguments, recalled in paragraph 94 of the judgment under appeal, that the Council had not adduced evidence of its claims relating to Fulmen's activity on the Qom/Fordoo site. Paragraph 99 must therefore be interpreted as meaning that the General Court considers that the Council must, when necessary, request the requisite evidence and information from the Member State which has proposed the restrictive measures, so as to be in a position to produce them in the context of the judicial review referred to in the next paragraph of the judgment under appeal.

58    As this Court recently noted in a review of restrictive measures, the Courts of the European Union must, in accordance with the powers conferred on them by the Treaty, ensure the review, in principle the full review, of the lawfulness of all Union acts in the light of the fundamental rights forming an integral part of the European Union legal order. That obligation is expressly laid down by the second paragraph of Article 275 TFEU (Joined Cases C-584/10 P, C-593/10 P and C-595/10 P *Commission and Others* v *Kadi* [2013] ECR I-0000, paragraph 97, '*Kadi II*').

59    Those fundamental rights include, inter alia, respect for the rights of the defence and the right to effective judicial protection (*Kadi II*, paragraph 98).

60    The first of those rights, which is affirmed in Article 41(2) of the Charter of Fundamental Rights of the European Union ('the Charter'), includes the right to be heard and the right to have access to the file, subject to legitimate interests in maintaining confidentiality (*Kadi II*, paragraph 99).

61    The second of those fundamental rights, which is affirmed in Article 47 of the Charter, requires that the person concerned must be able to ascertain the reasons upon which the decision taken in relation to him is based, either by reading the decision itself or by requesting and obtaining disclosure of those reasons, without prejudice to the power of the court having jurisdiction to require the authority concerned to disclose that information, so as to make it possible for him to defend his rights in the best possible conditions and to decide, with full knowledge of the relevant facts, whether there is any point in his applying to the court having jurisdiction, and in order to put the latter fully in a position to review the lawfulness of the decision in question (see Case C-300/11 *ZZ* [2013] ECR I-0000, paragraph 53 and case-law cited, and also *Kadi II*, paragraph 100).

62    Article 52(1) of the Charter nevertheless allows limitations on the exercise of the rights enshrined in the Charter, subject to the conditions that the limitation concerned respects the essence of the fundamental right in question and, subject to the principle of proportionality, that it is necessary and genuinely meets objectives of general interest recognised by the European Union (see *ZZ*, paragraph 51, and *Kadi II*, paragraph 101).

63    Further, the question whether there is an infringement of the rights of the defence and of the right to effective judicial protection must be examined in relation to the specific circumstances of each particular case (see, to that effect, Case C-110/10 P *Solvay* v *Commission* [2011] ECR I-10439, paragraph 63), including the nature of the act at issue, the context of its adoption and the legal rules governing the matter in question (see *Kadi II*, paragraph 102; see also, to that effect, in relation to compliance with the duty to state reasons, Joined Cases C-539/10 P and C-550/10 P *Al-Aqsa* v *Council* and *Netherlands* v *Al-Aqsa* [2012] ECR I-0000, paragraphs 139 and 140, and Case C-417/11

P *Council* v *Bamba* [2012] ECR I-0000, paragraph 53).

64      The effectiveness of the judicial review guaranteed by Article 47 of the Charter also requires that the Courts of the European Union are to ensure that the decision, which affects the person or entity concerned individually, is taken on a sufficiently solid factual basis. That entails a verification of the allegations factored in the summary of reasons underpinning that decision, with the consequence that judicial review cannot be restricted to an assessment of the cogency in the abstract of the reasons relied on, but must concern whether those reasons, or, at the very least, one of those reasons, deemed sufficient in itself to support that decision, is substantiated (see *Kadi II*, paragraph 119).

65      To that end, it is for the Courts of the European Union, in order to carry out that examination, to request the competent European Union authority, when necessary, to produce information or evidence, confidential or not, relevant to such an examination (see *Kadi II*, paragraph 120 and case-law cited).

66      That is because it is the task of the competent European Union authority to establish, in the event of challenge, that the reasons relied on against the person concerned are well founded, and not the task of that person to adduce evidence of the negative, that those reasons are not well founded (see *Kadi II*, paragraph 121).

67      For that purpose, there is no requirement that that authority produce before the Courts of the European Union all the information and evidence underlying the reasons alleged in the act sought to be annulled. It is however necessary that the information or evidence produced should support the reasons relied on against the person concerned (see *Kadi II*, paragraph 122).

68      If the competent European Union authority finds itself unable to comply with the request by the Courts of the European Union, it is then the duty of those Courts to base their decision solely on the material which has been disclosed to them, namely, in this case, the statement of reasons for the contested measure, the observations and exculpatory evidence that may have been produced by the person concerned and the response of the competent European Union authority to those observations. If that material is insufficient to allow a finding that a reason is well founded, the Courts of the European Union shall disregard that reason as a possible basis for the contested decision to list or maintain a listing (see *Kadi II*, paragraph 123).

69      If, on the other hand, the competent European Union authority provides relevant information or evidence, the Courts of the European Union must then determine whether the facts alleged are made out in the light of that information or evidence and assess the probative value of that information or evidence in the circumstances of the particular case and in the light of any observations submitted in relation to them by, among others, the person concerned (see *Kadi II*, paragraph 124).

70      Admittedly, overriding considerations pertaining to the security of the European Union or of its Member States or to the conduct of their international relations may preclude the disclosure of some information or some evidence to the person concerned. In such circumstances, it is none the less the task of the Courts of the European Union, before whom the secrecy or confidentiality of that information or evidence is no valid objection, to apply, in the course of the judicial review to be carried out, techniques which accommodate, on the one hand, legitimate security considerations about the nature and sources of information taken into account in the adoption of the act concerned and, on the other, the need sufficiently to guarantee to an individual respect for his procedural rights, such as the right to be heard and the requirement for an adversarial process (see *Kadi II*, paragraph 125, and, by analogy, *ZZ*, paragraphs 54, 57 and 59).

71      To that end, it is for the Courts of the European Union, when carrying out an examination of

all the matters of fact or law produced by the competent European Union authority, to determine whether the reasons relied on by that authority as grounds to preclude that disclosure are well founded (see *Kadi II*, paragraph 126, and, by analogy, *ZZ*, paragraphs 61 and 62).

72    If the Courts of the European Union conclude that those reasons do not preclude disclosure, at the very least partial disclosure, of the information or evidence concerned, it shall give the competent European Union authority the opportunity to make such disclosure to the person concerned. If that authority does not permit the disclosure of that information or evidence, in whole or in part, the Courts of the European Union shall then undertake an examination of the lawfulness of the contested measure solely on the basis of the material which has been disclosed (see *Kadi II*, paragraph 127, and, by analogy, *ZZ*, paragraph 63).

73    On the other hand, if it turns out that the reasons relied on by the competent European Union authority do indeed preclude the disclosure to the person concerned of information or evidence produced before the Courts of the European Union, it is necessary to strike an appropriate balance between the requirements attached to the right to effective judicial protection, in particular respect for the principle of an adversarial process, and those flowing from the security of the European Union or its Member States or the conduct of their international relations (see *Kadi II*, paragraph 128, and, by analogy, *ZZ*, paragraph 64).

74    In order to strike such a balance, it is legitimate to consider possibilities such as the disclosure of a summary outlining the information's content or that of the evidence in question. Irrespective of whether such possibilities are taken, it is for the Courts of the European Union to assess whether and to what the extent the failure to disclose confidential information or evidence to the person concerned and his consequential inability to submit his observations on them are such as to affect the probative value of the confidential evidence (see *Kadi II*, paragraph 129, and, by analogy, *ZZ*, paragraph 67).

75    In the present case, the General Court held, in paragraph 52 of the judgment under appeal, that the statement of reasons for the listing of Fulmen and of Mr Mahmoudian in the acts at issue, albeit brief, had enabled them to understand what Fulmen was accused of having done and to dispute either the truth or the relevance thereof.

76    Although Fulmen stated at the hearing that it was informed of the period relating to the matters of which it was accused – that is from 2006 to 2008 – only at the stage of the appeal proceedings, it must be noted that that period could readily be deduced from public documents, since the statement of reasons referred to the period preceding the discovery of the existence of the Qom site and Security Council Resolution 1929 (2010) indicates that the construction of the Qom plant was revealed in September 2009.

77    As regards the evidence of Fulmen's involvement in the installation of electrical equipment on the Qom/Fordoo site, the Council, the French Republic and the United Kingdom maintained that the production of documents demonstrating that involvement was unnecessary and, in any event, not possible owing to the confidential nature of those documents and the fact that the Rules of Procedure of the General Court require their communication to the other party.

78    In that regard, since the competent European Union authority refused to produce evidence to the Courts of the European Union, it is for those Courts, as is evident from paragraph 68 of the present judgment, to base their decision solely on the material which has been disclosed to them.

79    In the present case, the only evidence available to the Courts of the European Union is the claim made in the statement of reasons for the acts at issue. It is not substantiated by the production of information or evidence, such as a summary of the content of the information in question, further details of the electrical equipment allegedly installed on the Qom site or the reasons for identifying

Fulmen as having installed that equipment, and, therefore, for establishing that the allegations were well founded.

80    In the light of that fact, it must be held that Fulmen and Mr Mahmoudian were not in a position to defend themselves against the allegations and that the Courts of the European Union are not in a position to determine whether the acts at issue were well founded.

81    It is of little importance that Article 215(1) TFEU gives the Council the power to adopt general economic measures against the Islamic Republic of Iran. The measure that is subject to review by the Courts of the European Union is a targeted measure that covers not a particular economic sector but an individual undertaking on account of a specific alleged activity.

82    In the light of all those points, the General Court was right to find, in paragraph 103 of the judgment under appeal, that the Council had not adduced evidence that Fulmen was active on the Qom/Fordoo site.

83    Consequently, the appeal is unfounded and must be dismissed.

## Costs

84    Under Article 184(2) of the Rules of Procedure, where the appeal is unfounded or where the appeal is well founded and the Court itself gives final judgment in the case, the Court is to make a decision as to costs. Article 138 of the Rules of Procedure, which is applicable to appeal proceedings by virtue of Article 184(1), provides in paragraph 1 that the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings. Article 140(1) of the Rules of Procedure, which is applicable to appeal proceedings by virtue of Article 184(1), provides that the Member States and institutions which have intervened in the proceedings are to bear their own costs.

85    Since the Council has been unsuccessful, it must be ordered to pay the costs, in accordance with the form of order sought by Fulmen and Mr Mahmoudian.

86    The French Republic, the United Kingdom and the Commission, as interveners, shall bear their own costs.

On those grounds, the Court (Fifth Chamber) hereby:

1.    **Dismisses the appeal;**

2.    **Orders the Council of the European Union to pay the costs;**

3.    **Orders the French Republic, the United Kingdom of Great Britain and Northern Ireland and the European Commission to bear their own costs.**

[Signatures]

---

\* Language of the case: French.

© European Union
The source of this judgment is the Europa web site. The information on this site is subject to a Disclaimer and a Copyright notice and rules related to Personal data protection. This electronic version is not authentic and is subject to amendment.

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: *http://www.bailii.org/eu/cases/EUECJ/2013/C28012.html*