## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **FULMEN COMPANY, *et al.*,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Case No. 18-2949 (RJL) |
| | ) | |
| **OFFICE OF FOREIGN ASSETS** | ) | |
| **CONTROL, *et al.*,** | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

March 31st, 2020 [## 16, 19]

Fulmen Company and Fulmen Group ("Fulmen") brings this suit against the Office of Foreign Assets Control ("OFAC"), the United States Department of the Treasury, and Steven T. Mnunchin, in his official capacity as Secretary of the United States Department of the Treasury (collectively, "the Government"), seeking to challenge OFAC's decision to place Fulmen on its list of Specially Designated Nationals and Blocked Persons ("SDN List"). Compl. ¶ 1 [Dkt. # 1]. Fulmen alleges the Government violated the Fifth Amendment of the United States Constitution and the Administrative Procedure Act ("APA"). *Id.* at ¶¶ 35-69. The Government moves to dismiss, contending this Court lacks subject-matter jurisdiction to adjudicate Fulmen's constitutional claims and that OFAC's decision did not violate the APA. Fulmen cross moves for summary judgment. Upon consideration of the briefing, the relevant law, the entire record, and for the reasons stated below, the Government's motion to dismiss is **GRANTED** and Fulmen's cross-motion for summary judgment is **DENIED**.

# BACKGROUND

## I.    Relevant Law

The United States has long relied on economic sanctions to further its foreign policy and national security interests.  *See, e.g.*, Trading with the Enemy Act of 1917, 40 Stat. 411 (codified as amended at 50 U.S.C. app. §§ 1-44); 50 U.S.C. app. § 4305(b)(1) (as amended in 1933).  In 1977, Congress passed the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 *et seq.*, which grants the President broad discretion to sanction foreign entities and individuals in the event there is a national emergency.  Specifically, it authorizes the President to:

> . . . direct and compel, nullify, void, prevent or prohibit, any . . . transfer . . . of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . with respect to any property, subject to the jurisdiction of the United States . . . .

*Id.* § 1702(a)(1)(B).  Since IEEPA's passage, the President has imposed sanctions on countries and foreign individuals engaged in terrorism, narcotics trafficking, and the proliferation of weapons of mass destruction.  *See, e.g.*, Exec. Order No. 12978, 60 Fed. Reg. 54579 (Oct. 21, 1995) (blocking assets of persons who "play a significant role in international narcotics trafficking centered in Colombia"); Exec. Order No. 13224, 66 Fed. Reg. 49079 (Sept. 23, 2001) (blocking assets of persons determined "to have committed, or to pose a significant risk of committing, acts of terrorism that threaten" national security); Exec. Order No. 13382, 70 Fed. Reg. 38567 (June 28, 2005) (blocking assets of persons who have engaged in transactions that have materially contributed to the proliferation of weapons of mass destruction and their supporters).

As relevant here, the President issued Executive Order No. 12938 ("EO 12938") in 1994, which concluded that the "proliferation of nuclear, biological, and chemical weapons ('weapons of mass destruction') and of the means of delivering such weapons, constitute[d] an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." 59 Fed. Reg. 58099 (Nov. 14, 1994). EO 12938 further declared a national emergency to address that threat. *Id.* In 2005, the President issued Executive Order No. 13382 ("EO 13382") to take further action in response to the national emergency declared in the 1994 order. 70 Fed. Reg. 38567 (June 28, 2005). In addition to the individuals and entities specifically identified in the order, EO 13382 blocked all property and interests in property of:

> any foreign person determined by the Secretary of State, in consultation with the Secretary of the Treasury, the Attorney General, and other relevant agencies, to have engaged, or attempted to engage, in activities or transactions that have materially contributed to, or pose a risk of materially contributing to, the proliferation of weapons of mass destruction or their means of delivery (including missiles capable of delivering such weapons), including any efforts to manufacture, acquire, possess, develop, transport, transfer or use such items, by any person or foreign country of proliferation concern . . . [;]

> any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, the Attorney General, and other relevant agencies, to have provided, or attempted to provide, financial, material, technological or other support for, or goods or services in support of, any activity or transaction described in paragraph (a)(ii) of this section, or any person whose property and interests in property are blocked pursuant to this order; and . . .

> any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, the Attorney General, and other relevant agencies, to be owned or controlled by, or acting or purporting to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order.

*Id.* § 1(a)(i)-(iv). EO 13382 also authorized the Secretary of the Treasury to "take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to carry out the purposes of this order." *Id.* § 6. The Secretary in turn delegated that authority to OFAC. *See* 31 C.F.R. §§ 539.802 & 544.802.

Pursuant to that delegation, OFAC determines whether individuals and entities qualify under EO 12938 or EO 13382. *See id.* Individuals and entities that qualify under those orders ("Specially Designated Nationals" or "SDNs") are placed on a list ("SDN List") and blocked. *See* EO 13382, § 1(a); 31 C.F.R. § 501.807. An entity designated by OFAC as an SDN may "seek administrative reconsideration" or "assert that the circumstances resulting in the designation no longer apply." 31 C.F.R. § 501.807. In either case, OFAC's regulations permit the designated SDN to "submit arguments or evidence that [it] believes establishes that [an] insufficient basis exists for the designation" and "propose remedial steps . . . [to] negate the basis for designation." *Id.* § 501.807(a). Under OFAC's regulations, an SDN may also request a meeting with OFAC. *Id.* § 501.807(c). Any information submitted by an SDN "will be reviewed by [OFAC], which may request clarifying, corroborating, or other additional information." *Id.* § 501.807(b). After reviewing a request for reconsideration, OFAC "provide[s] a written decision" to the SDN. *Id.* § 501.807(d).

## II.    Factual Background

On November 21, 2011, OFAC designated Fulmen as an SDN under EO 13382, concluding it had "engaged, or attempted to engage, in activities or transactions that have

materially contributed to, or pose a risk of materially contributing to, the proliferation of weapons of mass destruction or their means of delivery" by Iran. *See* EO 13382, § 1(a)(ii); *see* Admin. R. ("AR") at 75, 76-77, 79. Specifically, OFAC determined that Fulmen "was involved in procuring goods for the covert uranium enrichment facility at Qom while the facility was still an undeclared site from 2006 through 2008." AR at 76. OFAC further found that "[f]rom May 2006 until at least September 2008, Fulmen was involved in many facets of the construction of Qom" and "worked with the U.S.- and UN- designated firm Kalaye Electric on the construction of elements of the Natanz Uranium Enrichment Plant." *Id.* In OFAC's view, because Iran had not yet "established full and sustained suspension of all enrichment-related and reprocessing activities, . . . Fulmen's activities at both Qom and Natanz . . . material[ly] contribut[ed] to those facilities' gas centrifuge plant for uranium enrichment." *Id.* OFAC's designation decision briefly noted that the European Council, which administers the European Union's sanctions program, had also designated Fulmen on its sanction list. *Id.* at 77.

Prior to OFAC's designation on the SDN List, Fulmen requested that the European Council remove Fulmen from its sanctions list. AR at 476. The Council denied that request. *Id.* at 476-77. Fulmen then sought relief in the EU General Court, which, in November 2013, annulled the sanctions designation because the Council refused to disclose its evidence to Fulmen. *Id.* at 471, 477. On December 17, 2013, the Council ultimately removed Fulmen from its sanction list. *Id.* at 490.

On October 20, 2014, Fulmen requested OFAC's reconsideration of its SDN List designation. *Id.* at 83. Fulmen asserted that it had "no link to the Iranian government" and

was not "involved in any nuclear projects, including, as accused, at the sites of Qom and Natanz." *Id.* On February 6, 2015, OFAC acknowledged receipt of Fulmen's request. *Id.* at 293. On July 19, 2015, Fulmen wrote to OFAC again, reiterating its request for removal and emphasizing that the European Council had removed Fulmen from its sanctions list. *Id.* at 294-95. In Fulmen's view, "the only reason that OFAC placed Fulmen Co. on its SDN list was because this company was already on the European Union (EU) sanction list." *Id.*

On October 6, 2015, OFAC requested additional information from Fulmen, including information regarding its relationship with two Iranian firms, Kalaye Electric and Arya Niroo Nik; its involvement in the construction of the nuclear site at Qom; and whether Fulmen had—in the last five years—provided any goods or services to Iran, Iranian entities identified on the SDN list, or any Iranian nuclear sites. *Id.* at 320-21. In its May 24, 2016 response, Fulmen stated it had "no interaction" with Kalaye Electric and "no relationship" with Arya Nirro Nik, and it denied any involvement in the Qom project. *Id.* at 335, 336. Fulmen admitted, however, that it had been "involved in the design, construction, and procurement of high voltage electricity delivery system[s] to municipalities and states throughout Iran." *Id.* at 336. It also represented that an entity named Saba Battery "recently started manufacturing lithium batteries and Fulmen might use these products" for certain projects. *Id.* at 384. Saba Battery, also known as Niru Battery Manufacturing Company ("Niru Battery"), had been designated by OFAC as an SDN pursuant to EO 13382 since April 7, 2009. *Id.* at 67 n.5, 70 n.13; *see also Additional Designation of*

*Persons and Identification of New Aliases Pursuant to Executive Order 13382*, 74 Fed. Reg. 19635-01, 19636 (Apr. 29, 2009).

On November 10, 2016, OFAC again requested more information from Fulmen. Specifically, it sought information regarding Fulmen's connection to Niru Battery and Saba Battery, including details of business transactions with those entities, use of their merchandise, and contact with their representatives. AR at 190-91. Fulmen responded on December 27, 2016, asserting it "does not have any special and / or direct relationship with Niru-Niroo/Saba Battery." *Id.* at 193. It nevertheless acknowledged that "[i]n the past 10 years, Fulmen and its contractors have been purchasing Saba Batteries (Niru Battery) . . . ." *Id.* at 195. In Fulmen's view, however, it was "forced to purchase" batteries from Niru Battery due to U.S. sanctions and Fulmen's designation on the SDN List. *Id.* at 194. It listed 19 transactions with Niru Battery, including several that occurred after OFAC designated Niru Battery as an SDN. *Id.* at 197-98.

On July 20, 2018, OFAC denied Fulmen's request to be removed from the SDN List. *Id.* at 65-73 (evidentiary memorandum), 501-02 (letter to Fulmen). It explained:

> After investigation and careful review of all the evidence before OFAC, including classified and open source information as well as material [Fulmen] submitted . . . , we find that Fulmen Company has not submitted credible arguments or evidence establishing that an insufficient basis exists for the company's designation or that circumstances resulting in the designation no longer apply. In particular, information available to OFAC contradicts statements made in the submissions that Fulmen Company had never worked with the Iranian firms Kalaye Electric or Arya Niroo Nik.

*Id.* at 501; *see also id.* at 503 (describing Fulmen's relationship with those entities). OFAC also concluded that in light of Fulmen's "stated business relationship" with Niru Battery,

an entity on the SDN List—itself sanctionable conduct—OFAC was "unable to conclude that Fulmen Company has engaged in remedial steps that would warrant the removal of Fulmen Company from the SDN List." *Id.* at 501-02. Although OFAC did not reveal to Fulmen the classified information it considered in reaching its decision, it provided "unclassified summaries." *Id.* at 503. Those summaries reported that: (1) Fulmen "acted as a procurement agent for the covert uranium enrichment facility at Qom;" (2) Fulmen "worked with the U.S.- and U.N.-designated firm KALAYE ELECTRIC COMPANY on construction of elements of the Natanz uranium enrichment plant;" (3) Fulmen "acted through intermediaries, including Arya Niroo Nik, to procure or supply equipment to the Qom or Natanz projects;" (4) Fulmen "had a financial relationship with the U.S.- and U.N.-designated firm KALAYE ELECTRIC COMPAY from 2006 to 2008;" (5) Fulmen had "dealings" with Arya Niroo Nik from 2007 to 2008; (6) Fulmen was "engaged in dealings" with Kalaye Electric "in connection with what is likely the Qom site;" and (7) Fulmen's statements denying relationships with Kalaye Electric and Arya Niroo Nik, as well as its "involvement in projects at the uranium enrichment facilities at Qom and Natanz," were not credible. *Id.*

After OFAC's denial of Fulmen's request for reconsideration, Fulmen filed this suit, bringing several causes of action under the Fifth Amendment and the APA. Fulmen alleges that OFAC violated its procedural and substantive due process rights because it failed to provide Fulmen notice and opportunity to be heard before designating it as an SDN. Compl. ¶¶ 38, 41. It further contends that OFAC violated the Takings Clause of the Fifth Amendment by "completely depriv[ing]" Fulmen of "all economically beneficial use of its

name, reputation, property[,] and assets without just compensation." *Id.* ¶ 46. Fulmen also asserts various APA claims, primarily based on its assertion that OFAC was required to remove Fulmen from the SDN list after The European Council removed Fulmen from the EU's sanctions list. *See id.* ¶¶ 53, 62. On March 25, 2019, the Government moved to dismiss Fulmen's complaint, and on April 22, 2019, Fulmen cross moved for summary judgment. The parties completed briefing on both motions on June 2, 2019.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(1), plaintiff bears the burden of establishing subject-matter jurisdiction. *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) "Standing is a necessary predicate to any exercise of federal jurisdiction, and if it is lacking, then the dispute is not a proper case or controversy under Article III, and federal courts do not have subject matter jurisdiction to decide the case." *Prisology v. Fed. Bureau of Prisons*, 74 F. Supp. 3d 88, 93 (D.D.C. 2014). "In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiffs." *Logan v. Dep't of Veterans Affairs*, 357 F. Supp. 2d 149, 153 (D.D.C. 2004). "[W]hen the inquiry focuses on the Court's power to hear the claim, [however,] the Court may give the plaintiff's factual allegations closer scrutiny and may consider materials outside the pleadings." *Id.*

When evaluating a motion under Federal Rule of Civil Procedure 56, summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). In APA challenges, however, "the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record." *Kadi v. Geithner*, 42 F. Supp. 3d 1, 8 (D.D.C. 2012). In that context, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* at 9.

## ANALYSIS

### I.    Fulmen's Constitutional Claims

Fulmen brings three claims under the Fifth Amendment of the United States Constitution: (1) a procedural due process claim based on OFAC's failure to provide notice and an opportunity to be heard prior to its designation as an SDN; (2) a substantive due process claim based on the Government's "arbitrary decision to include [Fulmen] on the SDN list without meaningful procedural protections;" and (3) a takings claim based on OFAC's failure to remove Fulmen from the SDN list, which Fulmen alleges "deprives [it] of all economically beneficial use of its name, reputation, property[,] and assets without just compensation." Compl. ¶¶ 35-48. Unfortunately for Fulmen, each of those constitutional claims fail for a simple reason: Fulmen lacks standing to assert them.

The Supreme Court has long held that non-resident aliens without substantial connections to the United States are not entitled to Fifth Amendment protections. *Jifry v. F.A.A.*, 370 F.3d 1174, 1182 (D.C. Cir. 2004) (citing *Johnson v. Eisentrager*, 339 U.S. 763, 771 (1950)). As a foreign national, that long-standing rule applies to Fulmen, and it bars Fulmen's constitutional claims. Although the Supreme Court has recognized that "aliens

[that] have come within the territory of the United States and established 'substantial connections' with this country" may be entitled to some constitutional protections, Fulmen has not established *any* connection to the United States, let alone a substantial one. *Id.* at 1182-83 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990)). In fact, Fulmen's complaint alleges just the opposite, stating Fulmen "ha[s] *no* connections to any U.S. person or U.S. entity." Compl. ¶ 9 (emphasis added). And Fulmen only doubles down on that admission in its briefing. *See* Pls.' Reply in Supp. of Mot. for Partial Summ. J. ("Pls.' Reply") at 7 [Dkt. # 22] (noting that Fulmen "has *no* significant nexus to the United States" (emphasis added)).

Fulmen's arguments to the contrary are not persuasive. It first attempts to leapfrog the standing inquiry entirely, arguing instead that its claims must proceed because OFAC's administrative procedures were constitutionally inadequate. Pls.' Opp. to Gov't Mot. to Dismiss ("Pls.' Opp'n") at 10-11 [Dkt. # 18]. But because Fulmen is not entitled to raise Fifth Amendment challenges to OFAC's decision-making, I need not—and indeed, should not—assess whether that decision-making passes constitutional muster. *See Prisology*, 74 F. Supp. 3d at 93.

One point of clarification on this issue: In a suit challenging the Government's revocation of non-resident alien pilots' airman certificates, our Circuit Court suggested that I need not decide whether plaintiffs are entitled to Fifth Amendment protections when, "even assuming that they are, they have received all the process that they are due." *Jifry*, 370 F.3d at 1183. Relying on that reasoning, other district courts have recently declined to reach the "antecedent" question of whether foreign plaintiffs are entitled to the

protections of the Due Process Clause, instead concluding their constitutional claims fail on the merits and disposing of the suit on those grounds. *See Fares v. Smith*, 249 F. Supp. 3d 115, 122 (D.D.C. 2017); *Joumma v. Mnuchin*, Civ. A. No. 17-2780, 2019 WL 1559453, at *10 n.13 (D.D.C. April 10, 2019). I am skeptical that our Circuit Court intended to *require* us to skip the standing inquiry in all cases. And, in cases like this one, where plaintiffs' allegations *foreclose* their ability to assert constitutional claims, it seems especially inappropriate to consider the merits. *See People's Mojahedin Org. of Iran v. United States Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999) (noting, in a case where plaintiffs' foreign status was *uncontested*, that "a foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise"); *see also 32 Cty. Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002) (dismissing plaintiffs' constitutional claims because they failed to demonstrate either a property interest or presence in the United States). Because Fulmen's own pleadings demonstrate no property or presence in the United States, it cannot establish the "substantial connections" necessary to potentially entitle it to constitutional protections as a non-resident alien.[1]

Fulmen also argues that it is "entitled to a constitutional claim for due process" because OFAC "froze [its] assets and would not permit [it] to acquire any property in the

---

[1] Fulmen points to *Cardenas v. Smith*, *see* Pls.' Opp'n at 11 n.11, which at most recognized that whether a non-resident alien can assert constitutional claims is a case-specific inquiry, 733 F.2d 909, 916-17 (D.C. Cir. 1984). That case does not control the result here. As noted *supra*, subsequent D.C. Circuit and Supreme Court cases have clarified that a foreign national is not entitled to constitutional protection absent substantial connections to the United States. Here, Fulmen's allegations confirm it has no connection to the United States.

United States." Pls.' Opp'n at 11.  I take Fulmen's contention to mean that it either has assets in the United States or hopes to acquire such assets.  Neither framing saves Fulmen's claims.  First, Fulmen's complaint does not allege that it has assets in the United States that were frozen by OFAC, or that it sought and was unable to acquire property in the United States.  *See* Compl. ¶¶ 9, 37-39, 46.  It cannot now expand on its claims in a late-breaking bid to establish "substantial connections" with the United States.  *See District of Columbia v. Barrie*, 741 F. Supp. 2d 250, 263-64 (D.D.C. 2010).  Second, Fulmen's statements are conclusory, vague, and find no support in the administrative record.  As such, they are utterly insufficient to establish the kind of "substantial connection" necessary for a foreign national to assert constitutional claims.  *See Conant v. Wells Fargo Bank, N.A.*, 60 F. Supp. 3d 99, 107 (D.D.C. 2014).

## II.    Fulmen's APA Claims

Fulmen asserts that OFAC's denial of its request to be removed from the SDN List violated the APA because (1) it was arbitrary or capricious; (2) exceeded OFAC's statutory authority; and (3) was unwarranted by the facts.  Compl. ¶¶ 51, 62, 69.  Each of those claims fails.

### A.  Whether OFAC's Decision Was Arbitrary and Capricious

Under the APA, courts may "set aside OFAC's action only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'"  *Islamic Am. Relief Agency v. Gonzalez*, 477 F.3d 728, 732 (D.C. Cir. 2007) (quoting 5 U.S.C. § 706(2)(A)).  This deferential standard of review does not permit a court to "substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm*

*Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Rather, a court must assess whether the agency's actions were "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* A court must affirm if the agency's findings are supported by "substantial evidence" and there is a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). "'Substantial evidence' is simply such relevant evidence as a reasonable person might accept as proof of a conclusion." *Jifry*, 370 F.3d at 1181. OFAC, in particular, is entitled to even greater deference—indeed, "extreme[] deferen[ce]"—because its decisions implicate national security and foreign policy. *Islamic Am. Relief Agency*, 477 F.3d at 734.

OFAC's decision not to remove Fulmen from the SDN List was neither arbitrary nor capricious. The record reflects that OFAC's initial decision to include Fulmen on the SDN List was based on Fulmen's involvement "in procuring goods for Iran's covert uranium enrichment facility at Qom;" its involvement "in many facets of the construction at Qom;" and its "work with U.S.- and U.N.- designated firm [Kalaye Electric Company] on the construction elements of the Natanz Uranium Enrichment Plant." AR at 66. In denying Fulmen's request for removal, OFAC requested and reviewed information provided by Fulmen, and it responded to Fulmen's arguments for reconsideration. *Id.* at 67-71. OFAC also considered classified evidence of Fulmen's involvement with these entities, and it provided unclassified summaries to Fulmen.[2] *Id.* at 501, 503. Based on its

---

[2] On June 14, 2019, the Government submitted *ex parte* the classified information on which OFAC relied, which the Court has since reviewed. *See* Notice of Classified Lodging [Dkt. # 24]; *see also* 50 U.S.C. § 1702(c); *Olivares v. Transp. Sec. Admin.*, 819 F.3d 454, 462 (D.C. Cir. 2016) (recognizing the court's inherent authority to review classified material *ex parte*, *in camera*). That

review, OFAC concluded that Fulmen had failed to "submit[] credible arguments or evidence establishing that an insufficient basis exists for the company's designation" because "information available to OFAC contradicts [Fulmen's] statements" that it had never worked with Kalaye Electric or Arya Niroo Nik. *Id.* at 501; *see also id.* at 503 (describing Fulmen's involvement with these entities). And even if that evidence were not enough, Fulmen admitted during OFAC's reconsideration review that it had transacted on numerous occasions with Niru Battery, an entity designated by OFAC as an SDN, which independently warrants Fulmen's SDN designation. *See id.* at 195, 197-98, 501-02; EO 13382, § 1(a)(iii).[3] Given that record, both classified and unclassified, as well as the deference owed OFAC, I simply cannot conclude its denial of Fulmen's request for removal from the SDN List was arbitrary or capricious. *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 75 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir.

---

information provides additional detail about Fulmen's conduct during the relevant period. To the extent Fulmen seeks to challenge OFAC's reliance on classified materials, that argument fails under our Circuit Court's precedent. *See People's Mojahedin Org. of Iran v. Dept' of State*, 327 F.3d 1238, 1242 (D.C. Cir. 2003) (approving nondisclosure of classified evidence under similar circumstances).

[3] Fulmen's attempts to downplay this affiliation are not persuasive. Pls.' Reply at 4-5. Fulmen contends that in its response to OFAC's request for additional information, it denied having a "special and / or direct relationship" with Niru Battery. *Id.* at 5. That may be so. But Fulmen admitted to numerous transactions with Niru Battery, and its characterization of the relationship is irrelevant. *See* AR at 195, 197-98. Fulmen also argues that it was improper for OFAC to rely on its transactions with a designated SDN because OFAC considers voluntary disclosure of past violations as a mitigating factor. Pls.' Reply at 4 & n.3. The fact that OFAC can *consider* voluntary disclosure at the penalty stage does not mean that this Court can or should overturn OFAC's decision to decline to remove an entity from the SDN List that disclosed violations. And here, Fulmen only disclosed the transactions during the reconsideration stage, after OFAC twice asked for additional information. *See* AR at 190-91, 195, 197-98, 320-21, 384.

2003) (concluding the record "demonstrate[d] a reasonable basis" for OFAC's determination).

The European Council's decision to remove Fulmen from *its* sanctions list does not, of course, warrant a contrary result. Fulmen contends that OFAC violated its own procedural requirements by failing to consider the EU's ruling. Pls.' Opp'n at 19-20. As an initial matter, the record demonstrates that OFAC *did* consider the EU courts' decisions, and it explained why those decisions were not determinative. AR at 67 n.6. But more importantly, nothing in IEEPA or OFAC's regulations requires OFAC to consider a foreign court's decision to remove Fulmen from its sanction list. *See* 31 C.F.R. § 501.807. Fulmen makes much of its claim that OFAC's 2011 designation of Fulmen was "based on the reciprocity system established with the EU." Pls.' Opp'n at 1; *see also id.* at 2, 4, 9, 19, 22. In Fulmen's view, OFAC only imposed sanctions because the EU did, and it was therefore required to remove sanctions if and when the EU did. The record, however, does not support Fulmen's assumption. OFAC included Fulmen on the SDN List after concluding it met the criteria set forth in EO 13382. AR at 75, 76-77, 79. And OFAC is certainly not bound by other countries' decisions to sanction or not sanction particular individuals and entities. It is tasked with protecting the national security, foreign policy, and economic interests of the United States, *see* 59 Fed. Reg. 58099, 31 C.F.R. § 501.101, and it is entitled to make its decisions based on the record before it, *see* 70 Fed. Reg. 38567, § 6.

In any event, I am "reluctant to rely on the decisions of other countries based on information that likely differed from the administrative record compiled by and available

to OFAC." *Kadi*, 42 F. Supp. 3d at 13. As another district court has pointed out, a foreign country's "decision[] may have been reached under different standards of proof or review," further "undermin[ing] any persuasiveness [it] would have." *Id.*; *see also Joumma*, 2019 WL 1559453, at \*3. Indeed, as Fulmen admits, EU courts impose a *higher* standard of proof than OFAC. Pls. Opp'n at 2 n.4. And, moreover, the EU General Court's decision to annul the European Council's sanctions designation of Fulmen was based on a procedural flaw: The Council had refused to submit any evidence at all justifying its designation of Fulmen. AR at 67 n.6. Here, OFAC made its decision based on developed record evidence.[4]

To the extent Fulmen challenges the facts underlying OFAC's decision, *see* Compl. ¶¶ 64, 68, Pls.' Reply at 8-9, those arguments are equally unavailing. Fulmen first asserts that OFAC's decision was not rational because it relied on "unreliable blogs, redacted information[,] and more than 60 pages of undisclosed/secret information." Pls.' Reply at 8. Our Circuit Court, however, has permitted the Government to rely on a "on a broad range of evidence, including intelligence data and hearsay declarations." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003). Nothing in this record warrants a departure from that well-established precedent. Fulmen next appears to

---

[4] Fulmen's reliance on OFAC's 2014 delisting of Ante Gotovina is similarly misplaced. Pls.' Opp'n at 20-21. As the Government points out, Gotovina was designated pursuant to a different Executive Order, which expressly permits designation of individuals "under open indictment by the International Criminal Tribunal for the former Yugoslavia." *See* Gov't Reply in Supp. of Mot. to Dismiss ("Govt' Reply") at 18-19 [Dkt. # 20] (citing 79 Fed. Reg. 7,280 (Feb. 6, 2014)). Thus, when the International Criminal Tribunal acquitted Gotovina, the underlying rationale for that particular designation no longer existed. Such considerations do not apply here, however, because EO 13382 does not include foreign proceedings as a basis for designation on the SDN list.

contend that OFAC erred in considering classified information because that information is now available to international bodies and no longer secret. Pls.' Reply at 8-9. That argument makes little practical sense, and Fulmen offers no legal support for it. *Id.*

## B. Whether OFAC Exceeded Its Statutory Authority

Pursuant to the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Fulmen contends that "OFAC's decision to deny [its] delisting request exceeds the agency's statutory authority because [Fulmen] ha[s] already been cleared by the Court of Justice of the European Union and removed from the European blocked list." Compl. ¶ 62. OFAC has broad discretion to block individuals pursuant to IEEPA and EO 13382, and this claim fails for the same reasons Fulmen's arbitrary-and-capricious claim fails. *See supra* at 16-17. Moreover, as the Government points out, the primary statutory restriction contained in IEEPA—namely that Executive's power to block entities may only be exercised "to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared"— contains no indication that OFAC's designation decisions are determined by European courts. 50 U.S.C. § 1701(b); Gov't Mot. to Dismiss at 29 [Dkt. # 16]. And if that were not enough, Fulmen fails to even press this claim in its opposition or cross-motion, thereby conceding it. *See* Pls.' Opp'n 18-22; *see generally* Pls.' Reply.

## C. Whether OFAC's Decision Was Unwarranted by the Facts

A court must set aside an agency action that is "unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." 5 U.S.C.

§ 706(2)(F). Fulmen argues that de novo review of OFAC's decision is appropriate here because "there is no guidance as to the standard of review, or any standard for that matter, by which OFAC must operate in rendering or removing its SDN designations." Pls.' Opp'n at 21-22. That is plainly wrong.

De novo review of agency decisions is appropriate only in rare circumstances "where there are inadequate factfinding procedures in an adjudicatory proceeding, or where judicial proceedings are brought to enforce certain administrative actions." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Indeed, our Circuit Court has *never* applied de novo review in an APA case, and it has indicated that agency procedures "must be *severely* defective before a court proceeding under the APA can substitute de novo review for review of the agency's record." *Zevallos v. Obama*, 793 F.3d 106, 112 (D.C. Cir. 2015) (quoting *Nat'l Org. for Women v. SSA*, 736 F.2d 727, 745-46 (D.C. Cir. 1984)) (emphasis added). Fulmen fails to identify any particular procedure it deems defective, instead taking issue with the substance of OFAC's decision in light of Fulmen's "adamant[] den[ials]" of involvement with uranium enrichment programs in Iran. *See* Compl. ¶¶ 66-69; *see also* Pls.' Opp'n at 21-22; Pls.' Reply at 14-15. That does not warrant de novo review. Nor is this a case where OFAC did not engage in *any* fact-finding procedures such that de novo review might be appropriate. *See Zevallos v. Obama*, 10 F. Supp. 3d 111, 118 n.2 (D.D.C. 2014)(noting OFAC's submission of a lengthy administrative record); *see also OKKO Bus. PE*, 133 F. Supp. 3d 17, 28-29 (D.D.C. 2015) ("At most, Plaintiff raises a question as to whether OFAC adequately explained its decision, but such an inadequacy would not constitute 'a deficiency in fact-finding procedures such as to warrant the de novo review of OFAC's

fact-finding procedures.'" (quoting *Pitts*, 411 U.S. at 142)). Thus, Fulmen is not entitled to *de novo* review, and its final APA claim accordingly fails.

### III.    Fulmen's Other Arguments

None of Fulmen's remaining arguments has merit.  Fulmen first requests a writ of mandamus requiring OFAC to remove Fulmen from the SDN List.  To obtain such a writ, Fulmen must establish "(1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016).  Fulmen fails to satisfy those criteria.  Most obviously, an adequate remedy exists for Fulmen's claims under the APA.  *See Citizens for Responsibility & Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 151-52 (D.D.C. 2013).  Fulmen also fails to establish a "clear and indisputable right to relief" or violation of a "clear duty to act" because IEEPA and EO 13382 grant OFAC broad discretion to make designation determinations.  *See id.* at 151; *see also Sulemane v. Mnuchin*, Civ. A. No. 16-1822, 2019 WL 77428, at *8 (D.D.C. Jan. 2, 2019) (rejecting request for writ of mandamus and observing did not show "clear and indisputable right to relief" in part because OFAC's denial of reconsideration was not arbitrary or capricious).  In light of those failings, Fulmen's request for mandamus is denied.

Second, Fulmen seeks discovery prior to any ruling on summary judgment.  Pls.' Opp'n at 24.  But Fulmen already agreed to a briefing schedule for summary judgment without discovery.  *See* Joint Meet & Confer Statement at 2 [Dkt. # 17].  And, absent "evidence that the agency has given a false reason[,] . . . discovery is inappropriate in cases

under the APA." *Kadi*, 42 F. Supp. 3d at 10 (quoting *Nat'l Treasury Employees Union v. Seidman*, 786 F.Supp. 1041, 1046 (D.D.C. 1992)); *see also Motor Vehicle Mfrs.*, 463 U.S. at 43 ("[A] court is not to substitute its judgment for that of the agency"). Nothing in the record suggests OFAC acted in bad faith or engaged in improper behavior, nor is the record "so bare . . . it prevents effective judicial review." *See OFAC v. Voices in Wilderness*, 382 F. Supp. 2d 54, 62-63 (D.D.C. 2005).

Finally, in a Hail-Mary attempt to save its beleaguered claim that the EU's decision to delist Fulmen requires that OFAC do the same, Fulmen argues that the doctrine of collateral estoppel applies and bars OFAC's designation of Fulmen on the SDN List. Pls.' Opp'n at 25-27. Please! Collateral estoppel requires, among other things, that the same issue being raised was previously contested by the same parties and submitted for judicial determination in the prior case. *Martin v. Dep't of Justice*, 488 F.3d 446, 454 (D.C. Cir. 2007). That doctrine does not apply here because the United States was not a party to the EU proceedings. *AFL-CIO v. Fed. Labor Relations Auth.*, 835 F.2d 1458, 1462 (D.C. Cir. 1987) (requiring mutuality of the parties for collateral estoppel to apply against the Government). Fulmen's related argument that this Court is required to recognize and enforce the EU's delisting decision is equally meritless. *See* Pls.' Opp'n at 27-28. "A judgment of a foreign country ordinarily has no greater effect in the United States than in the country where the judgment was rendered." Restatement (Fourth) of Foreign Relations Law § 487, Comment: d (2018). Thus, as the Government points out, "Fulmen can at most ask this Court to recognize the EU courts' decisions requiring the removal of Fulmen from

the EU sanctions lists." Gov't Reply at 25. It cannot, however, require OFAC to remove Fulmen from the SDN List.

## CONCLUSION

For all of the foregoing reasons, the Government's motion to dismiss is **GRANTED**, and Fulmen's cross-motion for summary judgment is **DENIED**. A separate order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge